Fink v. State.

LOUIS FINK v. STATE OF NEBRASKA.

FILED OCTOBER 16, 1914.  No. 18,617.

Assault: SUFFICIENCY OF EVIDENCE. The evidence, substantially set out in the opinion, is examined, and *held* insufficient to sustain a conviction of assault.

ERROR to the district court for Gage county: LEANDER M. PEMBERTON, JUDGE. *Reversed.*

*A. D. McCandless,* for plaintiff in error.

*Grant G. Martin, Attorney General, Frank E. Edgerton* and *Jean Cobbey, contra.*

REESE, C. J.

A complaint was filed in justice court in Gage county charging that plaintiff in error, who will hereafter be referred to as defendant, on the 6th day of November, 1913, "unlawfully and maliciously did assault and threaten in a menacing manner to shoot and kill one Anna Harms." A trial was had before the justice, who found defendant guilty as charged, and imposed a fine of $50, with $46.60 costs, and adjudged that he stand committed until the fine and costs were paid. He appealed to the district court, where a trial was had in which the court instructed the jury in effect that the prosecution was for an assault only. The jury found defendant "guilty as charged." Af-

ter the filing of a motion for a new trial and the overruling
of the same, the court sentenced the defendant to pay a
fine of $25, and the costs of prosecution, taxed at $82.30.
Defendant brings error.

It is contended that the court, in its instructions, and
after the introduction of the evidence, erred in limiting
the prosecution to a simple assault. We can see nothing
in this which could be of any prejudice to defendant. So
far as the instructions of the court to the jury are con-
cerned, we can see no cause for complaint.

The principal contention of defendant is that the evi-
dence is insufficient to sustain a verdict of guilty of even
an unlawful assault. At the time of the alleged assault,
defendant was between 82 and 83 years of age. He owned
a farm near Wymore, upon which were two houses, barns,
etc., some distance apart, in one of which houses defend-
ant resided, the other being occupied by Harms, who was
his tenant. Defendant procured his son-in-law Mr. Bet-
ting, who resided in Kansas, to come upon the farm, take
charge of its management to some extent at least, and re-
main thereon. On the day before the alleged assault, de-
fendant and his son-in-law Betting met Harms, and de-
fendant informed Harms that Betting was there looking
after defendant's interests on the farm, and to which
Harms assented by saying, "All right." Many of the ma-
terial statements of the state's witnesses were contradicted
by witnesses for the defense, but the testimony of the wit-
nesses for the state alone will be here considered. Those
witnesses were Harms, his wife, and their hired man,
Lewis. Mrs. Harms testified that on the day before the
altercation, Betting came to where she was digging pota-
toes. As what there occurred constitutes the basis for
what followed next day, we copy the essential portion of
Mrs. Harms' testimony: "Q. When did you first see him
on that day? A. I seen him cross the yard in the morn-
ing, and about an hour and a half before or right after
dinner I seen him go down towards our house, and in about
an hour and a half I seen him standing right behind me.
Q. You were busy digging potatoes at that time? A. Yes,

sir. * * * Q. Did you hear him approach? A. When I looked up and saw him, he said, 'How do you do,' and I said, 'How do you do,' and he said, 'Getting any potatoes?' and I said, 'No,' and he asked me whether I tried to raise potatoes on that ground before, and I told him, 'No,' and he began and examined the potatoes in the bucket, and he said, 'Late potatoes?' and I told him I didn't know what kind of potatoes they were. He examined the potatoes in my bucket, and he said, 'Yes, they are late potatoes,' and I told him I didn't know what kind they were, and he talked on, and said, 'Is this all the potatoes you have got?' I didn't answer that, and he walked off to the creek bank, and he stood there 10 or 15 minutes with his hands in his pockets and his cap pulled over his eyes doing nothing in particular; he was looking down the creek." She states that it frightened her when she first saw him. "I told Mr. Harms that evening that if that fellow was coming around every time I went outside and follow me around I wasn't going to stay there." It must be observed that no word was spoken by Mr. Betting, nor was there any act upon his part, which could give the least offense to any lady, nor did he, by word or act, violate the most stringent rules of decorum and politeness. When we consider that he had but a day or two before entered upon his duties to take charge of the management of the farm, it was but natural that he should examine the land and learn what he could as to its quality and what it could produce. It may be that at that time Mrs. Harms may not have known of Betting's relation to Fink, or to the land, but her husband did, and if she made the complaint to him that evening, as testified by her, it would be but natural for him to give to his wife the information which he possessed. There is a presumption that he did, but that is not material, for he well knew of the fact. There is a small artificial lake upon defendant's farm, which, as was his daily custom, defendant visited morning and evening. The next morning early, and without any knowledge of what had passed between Harms and his wife the evening before, he and Betting started to the lake, and, as

ducks sometimes visited its waters, he took his gun with him for the purpose of shooting, if any ducks were there. The road passed by the part of the farm occupied by Harms, his tenant, and the two men were walking orderly on their way. Mrs. Harms saw them approaching and went to where her husband and Lewis were. She says in her testimony: "I knew that Mr. Harms was going to ask this fellow who he was and what business he had around there." Harms did know who he was and his business there. Mrs. Harms knew that an altercation was to be had, and of which defendant and Betting were wholly ignorant. When their approach was discovered, Harms waited for them to come to where he was, when he stepped toward Betting, and asked him, whose slave driver he was, and to explain what business he had there. It appears from the evidence that Betting was an invalid, and defendant presented his gun and said, "Stand back, or I will shoot." Lewis ordered him to "put up" the gun, and he pointed it at Lewis. Mrs. Harms appears to have been standing behind her husband, and at that time she stepped around and said: "What do you mean by hiring strange men to follow me about the place?" when defendant presented the gun toward her. Just then Lewis spoke up and said, "Fred, that is plenty. You can have him pulled for that." Nothing further was said or done. Mrs. Harms testified that, when Harms walked up to Betting and asked him whose slave driver he was, he was shaking his finger at Betting. There can be no possible doubt, from the actions of the Harms party, that the three were there for an unlawful purpose, viz., that of assaulting a man over 82 years of age and his invalid son-in-law, but with no possible excuse therefor. The first salutation, "Whose slave driver are you," was calculated to provoke trouble, and was no doubt intended for that purpose. Mrs. Harms testified that the episode in the potato patch was the only time Betting had ever accosted her, and that he had never at any other time "followed her around." Defendant, no doubt realizing his inability at his infirm age to cope with the three, scared them off with the only weapon he is

shown to have had, and when they retreated, or as Mrs. Harms expressed, "backed off," he passed on his way, Lewis remarking "That is plenty.    You can have him pulled for that."   It is not contended that defendant made any attempt to shoot any one.   His act was at all times purely defensive.   He did not seek the quarrel and never at any time sought to prolong it.    The witnesses say he used rough language to them as he presented the gun. The two combined seem to have had the intended effect of scaring off his assailants, which was all he ever tried to do.   The testimony on the part of the defense presented a different contention, but we do not base our conclusion upon any conflict in the evidence.   If every word stated by the witnesses for the state is true, there was nothing more than an effective defense offered by defendant, and there was nothing upon which a conviction can rest.

The verdict and judgment are set aside, and the cause is remanded.

REVERSED.

ROSE, J., not sitting.